JERRY LYNN HALL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; KENNETH RALPH URANGA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hall v. Commissioner
Docket Nos. 4651-85, 4652-85
United States Tax Court
T.C. Memo 1990-244; 1990 Tax Ct. Memo LEXIS 251; 59 T.C.M. (CCH) 608; T.C.M. (RIA) 90244; May 21, 1990, Filed Hector C. Perez and Alan R. Herson, for the petitioners. Thomas J. Travers and Carl D. Inskeep, for the respondent. WRIGHT, Judge *252 . WRIGHT
*851 MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, respondent determined by notices of deficiency dated November 19, 1984, the following deficiencies in and additions to petitioners' Federal income tax: Jerry Lynn Hall
Addition to Tax
Taxable Year
Deficiency
Section 6653(b) [1]
1970
$  3,199.00
$ 1,600.00       1971
2,113.00
1,057.00       1972
10,041.00
5,021.00       1973
707.00
354.00       1974
6,910.00
3,455.00       1976
4,258.00
2,129.00       Kenneth Ralph Uranga
Addition to Tax
Taxable Year
Deficiency
Section 6653(b)
1970
$  4,305.00
$ 2,153.00    1971
2,607.00
1,304.00    1972
12,633.00
6,317.00    1973
707.00
354.00    1974
6,910.00
3,455.00    1976
5,023.00
2,512.00    *253 *852 The issues for decision are: (1) whether for the years at issue petitioners had any underpayment of tax due to fraud; (2) whether petitioners underreported their income for years 1970-1974; and (3) whether petitioners are liable for the addition to tax under section 6653(b). FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Jerry Lynn Hall and Kenneth Ralph Uranga (hereinafter referred to as Hall and Uranga, individually, or petitioners, collectively) resided in Laguna Beach, California, when they filed their petition in this case. Petitioners each filed an individual Federal income tax return (Form 1040) for taxable year 1968. K&J Specialties
In 1967, petitioners formed K&J Specialties, (K&J) a general partnership in which they were equal partners during the years at issue. Petitioners, through K&J, sold clothing, gifts, antiques, and jewelry. During 1968, petitioners operated one store in Meridian, Idaho. Petitioners filed an informational return (Form 1065) for K&J for the taxable year 1968. In 1969, *254 petitioners opened a store in downtown Boise, Idaho, which they operated under the name of the "Victorian Shop." Petitioners subsequently closed their Meridian store. From 1970 through 1974, petitioners opened two additional stores in Boise and one in McCall, Idaho. Petitioners opened the first of these additional Boise stores sometime in 1972 and operated it under the name of the "Victorian II." The second additional Boise store was opened in November 1973 and was operated until June 1974 under the name of the "Victorian Too." Petitioners purchased the property for the McCall store in 1971. Petitioners, through K&J, also purchased rental property during the years at issue. In 1970, they purchased rental property at 1005 Euclid Street in Boise, Idaho. In 1971, petitioners purchased additional rental properties including a fourplex at 1707 Pomander Road in Boise, a duplex and a cabin in McCall, and a residence at 1106 Vermont Street in Boise. During the years at issue, Uranga was responsible for managing and overseeing the day-to-day and general operations of the stores, including supervision of the bookkeeping secretary. Hall was in charge of the finances and was responsible *255 for preparing the partnership tax information. Hall has a degree in business administration and had taken some accounting courses as of the time of the filings of the returns in this case. Neither Hall nor Uranga drew any designated salary from K&J during the years at issue. Nor did either petitioner maintain a personal checking account during the years at issue. They took whatever money they needed from the stores' cash "till" and signed for it. 1970-1974 Returns
IRS Investigation
In January 1975, Revenue Officer Stephen Nestor (Nestor) of the IRS contacted petitioners regarding an unemployment tax return that had not been filed. During this meeting, Nestor asked petitioners whether they had filed partnership returns for K&J. Petitioners responded that they had. When Nestor requested to see the returns, however, petitioners replied that the returns were not available because they were attached to petitioners' Forms 1040, which were in storage. Nestor then asked petitioners whether they had filed their Forms 1040, and petitioners responded that they had. Nestor gave petitioners approximately 6 weeks to produce the subject partnership and individual returns. *256 After the January 1975 meeting, Nestor returned to his office and discovered that petitioners had never filed the returns as they claimed they had. The deadline set by Nestor passed, and petitioners did not produce the requested returns. Nestor then referred the case over to the Criminal Investigation Division (C.I.D.) of the IRS. Special Agent Warren Packard (Packard) of the C.I.D. was assigned to petitioners' case in early 1975. At that time, Packard had been with the C.I.D. for approximately two and one-half years and had worked on two or three investigations. On April 8, 1975, K&J filed an Application for Extension of Time to File (Form 2758) their 1974 partnership information return (Form 1065). In early May 1975, Packard sent letters to petitioners requesting a meeting. On May 21, 1975, Packard visited petitioners' place of business in Boise, Idaho, where he met with Uranga. Packard informed Uranga of his function as a special agent and advised him of his rights. Packard told Uranga that he had been unable to find returns filed for him since 1968 and asked Uranga if he had filed returns since 1968. Uranga replied that he did not know because Hall took care of filing *257 the returns, as *853 Hall had the business background and had been taking care of both of their returns for some time. Packard also questioned Uranga about the nature of K&J's business operations as well as its books and records. In response to Packard's question regarding personal loans made either to petitioners or K&J, Uranga stated that he had borrowed $ 20,000 from his father Richard Uranga, who had died in 1973. Uranga stated that neither he nor K&J had any other source of nontaxable income besides the loan from his father and some proceeds from insurance policies. Uranga further stated that he had not bought, owned, nor sold any property other than partnership real property during the previous 6 to 7 years. On May 27, 1975, Packard met with Hall at the Boise store and informed Hall of his function as a special agent and advised him of his rights. Uranga was also present. At this meeting, Hall informed Packard that he and Uranga had not filed income tax returns since 1968, since they "never got it together." In July or August of 1975, petitioners retained Howard Deeds (Deeds), a C.P.A., to prepare their 1969-1974 individual and partnership returns. Petitioners submitted *258 to Deeds single entry sets of records that were summarized by year on the front of the ledgers. Deeds prepared the returns based on the summary information submitted by petitioners. He did not examine or audit sales receipts, expense figures, or bank records. Deeds calculated cost of goods sold and beginning and ending inventories in the following manner. Deeds used the ending inventory figure from the 1968 partnership return as the beginning inventory in 1969 and used an inventory figure supplied by petitioners for the ending inventory in 1974. He then compiled a worksheet combining by years the sales and purchases from 1969 through 1974. Using these figures, Deeds calculated a gross profit average over the years 1969 through 1974 of approximately 21 percent. Using this gross profit average he "backed into" the beginning and ending inventories for the other years between 1969 and 1974. Deeds used this method rather than calculating the figures year-by-year because one year would have a large profit and the next year would have a substantial loss, and had he done the returns year-by-year it would have entailed filing loss carrybacks and loss carryforwards. In doing so, Deeds *259 ignored Uranga's statement to him that a more correct inventory figure would be retail less 50 percent, less 1/3 more. This statement was also written on one of the worksheets given to Deeds by petitioners. Deeds did not consider Uranga's statement because petitioners already had losses and following this method would only increase the losses. Deeds discussed petitioners' reported losses with them and inquired how they were able to finance the losses. Uranga replied that he had borrowed $ 40,000 from his father. Deeds prepared petitioners' individual income tax returns solely on the basis of the figures flowing from petitioners' interests in K&J as reflected in its partnership return. On September 16, 1975, petitioners each filed their individual tax returns (Forms 1040) for the years 1970 through 1974, inclusive. K&J also filed information returns (Forms 1065) for the taxable years 1970 through 1974, inclusive, at that time. After the filing of these returns, Packard met with Uranga on October 10, 1975, and indicated that there appeared to be some source of funds other than what was shown on the returns. At that time, Packard questioned Uranga about K&J's inventory valuation *260 methods. Uranga explained that they took inventory at retail and would reduce it by 50 percent since their markup was about 100 percent. Packard asked Uranga for copies of the inventory sheets. Packard received some loose sheets from petitioners but was unable to discern anything from them because there were no summary sheets. After performing a preliminary analysis of K&J's bank deposits, Packard informed petitioners during a June 1, 1976 meeting that it appeared that K&J had underreported its income by about $ 40,000 per year. Packard had determined the need for a bank deposit analysis in petitioners' case because petitioners' business involved a large number of cash sales of small items, and because of their inadequate records, Packard was unable to trace individual sales to determine whether they were reported. At this meeting, petitioners first brought up several items that they claimed could have accounted for the discrepancy. Uranga mentioned funds received from his father over a period of time in addition to the $ 20,000 that he initially told Packard about. Uranga claimed that these funds totaled an additional $ 20,000 and were given to him in varying amounts in the *261 back room of his father's business, the Cactus Bar. Uranga also told Packard of three sales of coins from his personal coin collection in 1971 and 1972, totalling $ 11,000. After the meeting, Uranga told Packard of insurance proceeds received for damaged goods, as well as a student loan, which might have accounted for the bank deposits discrepancy. Uranga also told Packard, for the first time, of an inheritance from his mother, which his father borrowed and paid back to Uranga at some undisclosed time. After the June 1, 1976 meeting, Hall first told Packard that he had received loans and gifts of money from his mother, Velma Blackwell (Blackwell). *854 Packard investigated the explanations provided by petitioners. Packard analyzed Richard Uranga's tax returns and available records from his estate and concluded that Richard Uranga did not have sufficient funds to make a second loan of $ 24,000 to his son during the years 1970 through 1974. Packard also interviewed Blackwell, who told Packard that she had neither loaned nor given money to either Hall or Uranga. Packard also found that Uranga had not received a student loan during the years 1970 through 1974. In his computation *262 of net income for K&J using the bank deposits method, Packard included $ 20,000 in loans from Richard Uranga as a nonincome item. Packard also included as nonincome items coin sales of $ 5,000 and $ 6,000 for the years 1971 and 1972, respectively. He did not, however, include the amount Uranga claimed to have inherited from his mother because he had no way of verifying the amount, nor did he include the additional $ 20,000 Uranga claimed to have received from his father. Petitioners' Criminal Proceedings
On April 10, 1979, petitioners were each indicted on two counts of violating section 7201 for calendar years 1972 and 1974, respectively. In particular, the indictment charged that petitioners "did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing" by reporting losses and no tax due for 1972 and 1974 when they knew that their taxable income and tax owed were as follows: 1972
Taxable Income
Tax
Hall
$ 31,258.83
$ 6,625.70
Uranga
31,258.83
6,625.70
1974
Hall
$ 14,223.96
3,264.83
Uranga
14,223.96
3,264.83
At their criminal trial, petitioners called several witnesses who *263 testified about gifts made to petitioners that had not been accounted for in the IRS' criminal investigation. Petitioners' criminal trial was the first time that Packard became aware of these purported gifts. One witness was Egbert Pettey (Pettey), who was a friend of petitioners and is now deceased. Another witness was Minnie Mae Applegate, a neighbor of petitioners in Boise. Petitioners were convicted by the jury. However, the Court of Appeals for the Ninth Circuit reversed and remanded petitioners' case because of the District Court's failure to instruct the jury on the inferences and assumptions underlying the net worth and bank deposits methods of proof. United States v. Hall, 650 F.2d 994, 996 (9th Cir. 1981). Thereafter, petitioners each pleaded guilty to two counts of violating section 7201 for calendar years 1972 and 1974, respectively. 1976 Return
Petitioners each filed their 1976 Forms 1040, which were prepared by Deeds. On their returns, petitioners each claimed a net operating loss carryforward of $ 22,838 which in part consisted of net operating losses from 1971, 1972, 1973, and 1974. After he prepared petitioners' returns, Deeds discussed *264 them with petitioners. Petitioners' 1976 returns were not subject to Packard's criminal investigation. Other Matters
Uranga submitted a financial statement to First Security Bank showing the 1971 income of K&J to be substantially different from that reflected on K&J's Form 1065; the financial statement reflected a net profit while the tax return showed a net loss. Uranga knew that the financial statement set forth false information. During a deposition taken under oath in an unrelated civil matter prior to any contact with Packard, Uranga testified that his father gave him no loans after May 1, 1971. Respondent's Notices of Deficiency
In his notices of deficiency, respondent determined that for 1970-1974 petitioners' books and records for K&J were inadequate, and accordingly, respondent used the bank deposits method for determining K&J's, and correspondingly, petitioners' income for those years. In his bank deposit analysis for K&J, respondent allowed as nonincome items the $ 20,000 from Richard Uranga and $ 11,000 for the sale of Uranga's coin collection. For 1976, respondent disallowed the $ 22,838 claimed by each petitioner as net operating loss deductions carried *265 forward from years 1971-1975. OPINION Fraud under Section 6501(c)(1)
Because the general 3-year period of limitation under section 6501(a) on assessment and collection of the deficiencies at issue has expired, we must as a threshold matter decide whether any part of the deficiencies herein are due to fraud so that section 6501(c)(1) is applicable. Under that subsection, tax may be assessed at any time in the case of a false or fraudulent return with the intent to evade tax. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The burden that respondent bears in proving fraud under section 6501(c)(1) is the same one he bears for purposes of the addition to tax under section 6653(b). Ruidoso Racing Assn., Inc. v. Commissioner, 476 F.2d 502, 505, 507 (10th Cir. 1973), affg. in *855 part and revg. in part a Memorandum Opinion of this Court. Therefore, respondent must establish by clear and convincing evidence that petitioners each underpaid his taxes for each of the years at issue and that some part of that underpayment *266 was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). The issue of fraud presents a factual question which must be decided on the basis of an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Mensik v. Commissioner, 328 F.2d 147 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. 213, 224 (1971); Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Fraud is never presumed, but rather, must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85 (1970). Fraud may be proved by circumstantial evidence and inferences drawn from the record because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983); Stephenson v. Commissioner, 79 T.C. 995 (1982), *267 affd. 748 F.2d 331 (6th Cir. 1984). Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing, effectuated by conduct designed to conceal, mislead, or otherwise prevent the collection of such tax. Stoltzfus v. United States, 398 F.2d 1002 (3d Cir. 1968); Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Fraudulent intent may be inferred from a pattern of conduct. Spies v. United States, supra at 499. A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, 53 T.C. 96 (1969). Fraud may also be inferred where the taxpayer makes false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980), or files false documents. Stephenson v. Commissioner, supra. *268 Similarly, understated income, inadequate records, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities are all indicia of fraud. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Furthermore, fraudulent intent may be more easily inferred where the taxpayer is intelligent, educated, and knowledgeable about taxes. Simms v. Commissioner, 422 F.2d 340 (4th Cir. 1970), affg. a Memorandum Opinion of this Court; O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969), affg. in part and revg. in part a Memorandum Opinion of this Court. Although failure to file does not in itself establish fraud, it may properly be considered in connection with other facts in determining whether any deficiency or underpayment of tax is due to fraud. Grosshandler v. Commissioner, supra at 19; Beaver v. Commissioner, supra; Bennett v. Commissioner, 30 T.C. 114 (1958). A. 1972 and 1974
At the outset we note that as a result of their pleading guilty to violating *269 section 7201 for 1972 and 1974, petitioners are collaterally estopped from denying that a part of the deficiencies in those years was due to fraud. Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68, 74-75 (1964). Therefore, fraud is established for 1972 and 1974. B. 1970, 1971, and 1973
Respondent argues that petitioners' fraudulent intent to evade taxes may be inferred from the many indicia of fraud present in the instant case. In particular, respondent contends that petitioners' consistent failure to file their income tax returns, despite knowing that they were obligated to do so, reveals a pattern of behavior resulting from their intent to fraudulently evade taxes. Moreover, respondent asserts that petitioners' deceptive and inconsistent statements to IRS agents also indicated fraudulent intent. Respondent further argues that petitioners' consistent failure to report substantial amounts of income constitutes effective evidence of fraudulent intent. Respondent also points to petitioners' failure to maintain adequate books and records as another indicia of fraud. Finally, respondent argues that petitioners' 1970, 1971, and 1973 returns were prepared using *270 the same fraudulent practices employed by petitioners in the preparation of their 1972 and 1974 returns. Petitioners counter that respondent's fraud investigation was flawed because Packard failed to take into consideration Hall's notation on the inventory sheets that the inventory figures used by Deeds were too high. Therefore, petitioners argue that respondent has failed to show that there was any deficiency attributable to fraud. Alternatively, petitioners contend that their cooperation in the investigation was sufficient that we should not find fraud. Petitioners also *856 assert that the inconsistencies cited by respondent are explainable and do not establish fradulent intent. For the reasons stated below, we hold that respondent has proved by clear and convincing evidence that each petitioner underpaid his taxes for 1970, 1971, and 1973, and that some part of each underpayment was due to fraud. 1. Consistent Significant Underreporting of Income
We first note that respondent determined that petitioners' records were inadequate and therefore recomputed their income using the bank deposits method. Petitioners' income for 1970, 1971, and 1973, as recomputed by respondent, *271 was significant while they reported losses in those years. Such a pattern of significant underreporting is evidence of fraudulent intent. Petitioners challenge several aspects of respondent's bank deposit analysis in arguing that respondent has failed to show any underpayment due to fraud. a. Inventory adjustments
We reject petitioners' argument that respondent's recomputation of petitioners' income was flawed because he failed to take into account Hall's notation that K&J's inventory was too high and should have been reduced. Respondent was reasonable in using the inventory figures as reported by petitioners. Moreover, Deeds' testimony of how he computed the inventory was consistent with Uranga's explanation to Packard of K&J's inventory valuation method. Furthermore, nothing in the record other than Uranga's notation and testimony, which we find to be self-serving and not credible, supports petitioners' contention that the inventory figures were too high. Finally, we note that the reason of the Court of Appeals for the Ninth Circuit for reversing and remanding petitioners' criminal conviction was not, as asserted by petitioners, based in part on respondent's failure *272 to investigate Uranga's notation that the inventory figure was too high. The inventory issue was but one of the issues on appeal. Rather, the Court of Appeals for the Ninth Circuit reversed and remanded petitioners' convictions because of the District Court's failure to instruct the jury on the inferences and assumptions underlying the net worth and bank deposits method of proof. With respect to the inventory issue, the Ninth Circuit left it to the District Court on remand to "require a showing by the Government that it has investigated [petitioners'] claimed figures and has justifiably rejected them." United States v. Hall, 650 F.2d 994, 1000 (9th Cir. 1981). Although Packard conducted no additional investigation after petitioners' case was remanded, he testified in the instant case that during his investigation he rejected Uranga's notation because reducing petitioners' K&J inventory would have been illogical. Packard testified that a retailer that marked up its inventory by 100 percent of cost, as Uranga initially claimed to have done, would have a gross profit percentage of 50 percent. [2] K&J's gross profit percentage, as reported by petitioners, was 21 *273 percent, which is plainly inconsistent with Uranga's assertion that K&J used a 100 percent markup. K&J's gross profit percentage based on the figures determined by respondent in his notices of deficiency was approximately 41 percent. Packard testified that any reduction in inventory would result in a lower gross profit percentage, which would create a further deviation from the theoretically correct 50 percent. We agree with Packard's analysis. We found him to be a highly credible witness, who possessed an excellent command of the facts of petitioners' case. To the contrary, Uranga's testimony contradicted his earlier statements to Packard at the beginning of the investigation. Moreover, because petitioners failed to maintain adequate books and records [3] their position is supported only by Uranga's testimony, which we find to be self-serving and not credible. Accordingly, respondent was justified in not performing any further investigation of Uranga's notation. *274 b. Other sources of nonincome items
We further note that petitioners have failed to show any tenable explanation for the significant unexplained deposits revealed by respondent's bank deposit analysis. Instead, petitioners have offered a litany of constantly changing, ever-increasing explanations of nonincome and nonbusiness sources of the unreported bank deposits. We dismiss each of petitioners' explanations for the reasons stated below. i. Loans from Richard Uranga
First was petitioners' contention that Uranga's father lent him $ 24,000 in addition to the $ 20,000 gift initially claimed by petitioners and accounted for by respondent in his bank deposit analysis as a nonincome item. Uranga initially told Packard that his father had given him $ 20,000, although Uranga told Deeds that he had been given $ 40,000. Later, when Packard informed petitioners of the underreporting *857 discrepancy, Uranga first told Packard of funds lent to him by his father in addition to the $ 20,000 he initially told Packard about. Packard then performed a thorough analysis of Richard Uranga's tax returns and the available records of his estate and determined that he did not have sufficient *275 funds during the period from 1970 through 1974 to make the $ 24,000 loan to Uranga. At the trial in the instant case, Uranga testified that he received the $ 24,000 from his father between November 1971 and March 1972. Yet Uranga also admitted at trial that he had earlier testified in a deposition taken under oath in an unrelated civil matter that his father gave him no loans after May 1971. Uranga's contradictory statements, particularly his prior testimony in the unrelated civil matter, sap all credibility from his testimony in the instant case. Moreover, we are persuaded by Packard's thorough analysis and credible testimony that respondent was correct in not including as a nonincome item in his bank deposit analysis the purported $ 24,000 loan from Richard Uranga. ii. Coin sales
We similarly dismiss petitioners' contention that over $ 20,000 of K&J's bank deposits for 1971 and 1972 represented sales from Uranga's coin collection. Petitioners first brought up the coin sales after Packard informed them of the discrepancy revealed by his initial bank deposit analysis. Uranga then informed Packard of three sales from Uranga's personal coin collection totalling $ 11,000. *276 In his report, Packard accounted for the $ 11,000 as a nonincome item. At his criminal trial, however, Uranga testified that the coin sales totalled $ 15,300. Furthermore, Uranga testified at trial in the instant case that the coin sales totalled $ 20,300, but we dismiss his testimony as self-serving. Petitioners offer no documentary evidence to support the amount of coin sales that they assert. Accordingly, we find no error in respondent's taking into account only $ 11,000 as a nonincome item in his bank deposit analysis. iii. Gifts from Minnie Mae Applegate
At their criminal trial, petitioners first raised the issue of gifts to them from Minnie Mae Applegate (Applegate), a neighbor of theirs in Boise, as a nonincome source for the years at issue. In the instant case, Uranga testified that in 1971, Applegate gave petitioners a trunk and an antique refrigerator. Uranga further testified that the trunk included Applegate's collection of dolls, which were sold for approximately $ 6,000 in either May or June of 1973, and that petitioners deposited the proceeds into one of the K&J accounts. Applegate did not testify in the instant case. Petitioners offer no evidence of *277 this purported gift and subsequent sale other than Uranga's self-serving testimony. Therefore, we find that respondent properly excluded it from his bank deposit analysis. c. Expansion of K&J
During the years at issue, petitioners acquired several pieces of property and opened several new stores, despite reporting significant losses from their business. In the absence of any tenable argument by petitioners on how they were able to expand their business and acquire the various pieces of property, we find this to be an indication of underreported income. 2. Failure to File Returns
Another indicia of fraud is petitioners' failure to file their 1970-1974 individual and partnership tax returns until after the commencement of the criminal investigation. Petitioners were both aware of the requirement to file these returns as shown by their filing returns for 1968. This is particularly applicable to Hall, who had assumed the overall responsibility of filing the returns of K&J. Petitioners' explanation that they failed to do so because they were too busy and never did get around to it is simply not believable. 3. Inconsistent and Misleading Statements to IRS Agents
*278 A further badge of fraud is the inconsistent statements made by petitioners to various IRS agents. Petitioners initially told Nestor that they had filed returns for the years at issue. They later admitted to Packard that they had not. Moreover, Packard testified that during the course of his investigation petitioners repeatedly assured him that they had adequate books and records for K&J, yet petitioners later told him that they had either been misplaced or destroyed. Furthermore, as previously discussed, petitioners' list of nonincome sources grew with the investigation, even though Packard inquired about them at his first meetings with petitioners. 4. Lack of Adequate Books and Records
A further indicia of fraud is a lack of adequate books and records. We have reviewed the books and records introduced into evidence and we find them to be inadequate. Petitioners advance no argument as to their lack of adequate books and records except to argue that they submitted certain books and records to their previous attorney and to respondent during the administrative stage of this case. These arguments are without support, and we shall not address them further. 5. Fraudulent *279 Statements
As a final badge of fraud, we note Uranga's willingness to make false statements. He admitted at trial that in 1971 he knowingly filed with a bank a false financial statement for K&J that *858 showed them making a profit while they reported a loss on their tax return. Uranga testified that he "just made up" the numbers. We find simply implausible petitioners' explanation that this behavior should be excused because one of the bank's employees told Uranga that it did not matter what he put down on the statement. 6. Petitioners' Cooperation
We also reject petitioners' contention that we should not find fraud because they cooperated with the IRS in the criminal investigation. Petitioners' cited support, Kotmair v. Commissioner, 86 T.C. 1253 (1986), does not support such a proposition. Rather, we held in Kotmair v. Commissioner, supra, that the "mere failure to file a return, standing alone, is not sufficient" to sustain the section 6653(b) addition to tax. 86 T.C. at 1261. In that case, the taxpayer filed a protestor-type *280 return disclosing only his name, address, social security number, and occupation and refused to give any further information based on various meritless and frivolous legal and constitutional grounds. We held that there was no fraud because there was no other evidence of fraud, such as falsification of books or records or concealment. In the instant case, petitioners filed their returns only after the commencement of the criminal investigation. Moreover, respondent has introduced other indicia of fraud in addition to petitioners' failure to file. Furthermore, the record does not support a finding that petitioners were cooperative. Although Packard testified that petitioners cooperated with him to some degree, he also testified that they consistently utilized delaying tactics and were not responsive to his phone messages. In addition, petitioners made various inconsistent statements to Nestor and Packard, as previously discussed. C. 1976
We next address whether respondent has proved fraud for 1976 by clear and convincing evidence. Respondent argues that petitioners fraudulently claimed excess net operating loss carryovers from 1971-1974 on their 1976 individual returns. *281 In support of his argument, respondent contends that petitioners knew at the time they signed their 1976 returns that the net operating loss carryovers were false and fraudulent. Respondent further argues that petitioners' use of these net operating loss carryovers to offset their 1976 tax liabilities was an intentional fraudulent attempt by each petitioner to evade 1976 income tax. Respondent also argues that petitioners' fraudulent conduct in 1976 may be inferred from his pattern of fraudulent conduct from 1970-1974. Petitioners counter that respondent has failed to carry his burden of proof because he has not shown petitioners' intent when they signed the return. Petitioners argue that Packard's testimony is not relevant because he did not investigate 1976. In addition, petitioners assert that their return preparer had no reason to believe that their 1970-1976 returns were incorrect when he prepared them, nor when he carried forward the net operating losses from 1971-1974 to their 1976 return. Rather, petitioners argue, their return preparer, in trying to follow good tax return preparation standards, merely performed the mechanical application of carrying forward net operating *282 losses. Furthermore, petitioners contend that nothing in the record shows that they were familiar with the complex laws applicable to net operating loss carryforwards. We hold that respondent has shown by clear and convincing evidence fraud by petitioners in filing their 1976 returns. We have already held that petitioners' returns for 1971-1974, and correspondingly their claimed losses, were fraudulent. Although petitioners might not have been cognizant of all the intricacies of the net operating loss provisions, their 1976 returns plainly reflected that losses from 1970-1974 were carried forward and used in 1976. Indeed, when they filed their 1976 returns, petitioners were aware of the IRS criminal investigation of the years 1970-1974, which began in May 1975. Moreover, Deeds, who prepared petitioners' returns, discussed their 1976 returns with them. Petitioners focus their argument on Deeds' state of mind when he prepared the returns. Deeds' state of mind, however, is irrelevant. Accordingly, based on all the evidence in the record, we hold that petitioners each underpaid his tax for 1976 and that their respective underpayments were due to fraud because they knew that the *283 net operating losses carried forward from 1971-1974 were fraudulent. [4]
UDeficiencies for 1970-1974 and 1976 Having found that the period of limitation on assessment and collection is open for the years at issue, we next address the underlying deficiencies. Respondent's determinations are presumed correct. Accordingly, petitioners bear the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Petitioners argue that respondent's determinations of the deficiencies for 1970-1974 were arbitrary and should not be accorded the ordinary presumption of correctness. Petitioners also assert that respondent *284 cannot rely on the *859 failure of petitioners to meet their burden of proof because respondent failed to perform a "lead-check" investigation into petitioners' inventory problem. In the alternative, petitioners contend that they have proved that respondent erroneously omitted certain nonincome items in his bank deposit analysis. A. Whether Respondent's Determinations were Arbitrary
Petitioners argue that respondent was arbitrary in increasing K&J's income, and correspondingly petitioners', by adding cash withdrawals in the amount of $ 11,269, $ 12,090, $ 12,852, $ 13,959, and $ 14,984 for 1970, 1971, 1972, 1973, and 1974, respectively. Packard testified that the main difference between the bank deposit analysis he performed in his criminal investigation and the one used by respondent in the notices of deficiency was that in the latter, respondent added back cash withdrawals for personal living expenses. Packard further testified that respondent's agent who prepared the notices of deficiency based these figures on Bureau of Labor statistics for 1970-1974 for annual personal living expenses. Petitioners argue that Packard's testimony concerning how cash withdrawals were calculated *285 on the notices of deficiency was hearsy. Therefore, petitioners argue, respondent's determination of cash withdrawals for personal expenses was based solely on hearsay evidence. Petitioners then cite Dellacroce v. Commissioner, 83 T.C. 269 (1984), as support for the proposition that respondent's determination were arbitrary because it was based solely on hearsay evidence. Without addressing the issue of hearsay, we note that petitioners' reliance on Dellacroce v. Commissioner, supra, is misplaced. The examination of whether a notice of deficiency is arbitrary involves going behind the notice and exploring the underpinnings of it. Llorente v. Commissioner, 74 T.C. 260, 264 (1980), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981); Jackson v. Commissioner, 73 T.C. 394, 400 (1979). As a general rule, this Court will not look behind the notice of deficiency to examine the evidence used in making the determination. Dellacroce v. Commissioner, supra at 280; Riland v. Commissioner, 79 T.C. 185, 201 (1982); *286 Llorente v. Commissioner, 74 T.C. at 264; Jackson v. Commissioner, supra at 400; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). On rare occasions we have recognized an exception to this rule and have looked behind the notice of deficiency in cases involving unreported illegal income where the Commissioner introduced no substantive evidence, but instead rested on the presumption of correctness, and the taxpayer challenged the notice of deficiency. Dellacroce v. Commissioner, supra; Jackson v. Commissioner, supra.In Dellacroce v. Commissioner, supra, the Commissioner's deficiency determination was based entirely on hearsay evidence linking the taxpayer to an illegal tax-generating activity. We held that determination arbitrary because there was no admissible evidence linking the taxpayer to the illegal activity. Dellacroce v. Commissioner, supra at 284. The instant case does not involve unreported illegal income, so the exception to the general rule of not going behind the notice as applied in Dellacroce v. Commissioner, supra, *287 is inapposite. Moreover, we find that petitioners have not proved that respondent should have added back to income no more than $ 2,000 per year for each petitioner. Petitioners told Packard that they took money from the cash tills of their stores whenever they needed it. Petitioners introduced no records of these withdrawals, and we draw a negative inference from that. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Furthermore, there is no support for petitioners' asserted amount of $ 2,000 per year other than their testimony that they incurred minimal personal expenses. We find this asserted figure unreasonable and petitioners' testimony not credible and self-serving. B. The "Lead-Check Rule"
Petitioners contend that the "lead-check rule," which was first articulated in Holland v. United States, 348 U.S. 121 (1954), is applicable to their case. Specifically, they argue that because respondent failed to investigate the "lead" created by Uranga's notation on the inventory sheets, respondent cannot rely on petitioners' failure to meet their burden of proof. *288 In addition, petitioners assert that respondent's determination must fail because he cannot a show a deficiency. Respondent counters that the "lead-check rule" is not applicable to the instant case. We agree with respondent. Holland v. United States, supra, involved criminal tax fraud under the predecessor to section 7201. The Supreme Court made the following comments on its concerns with the use of the net worth method:
When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer -- leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the *860 validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. * * * [Holland v. United States, supra at 135.]
The "lead-check *289 rule" has been extended to civil tax fraud cases. Fairchild v. United States, 240 F.2d 944 (5th Cir. 1957). In Tunnell v. Commissioner, 74 T.C. 44, 56 (1980), affd. per curiam 663 F.2d 527 (5th Cir. 1981), however, this Court held that the rule is not applicable to the deficiency portion of a civil-tax fraud case where the taxpayer bears the burden of proof. Petitioners attempt to distinguish their case from Tunnell by arguing that in the instant case, the burden of proving fraud was initially on respondent. This distinction is mistaken. Tunnell v. Commissioner, supra, is not factually distinguishable from the instant case as to the application of the lead-check rule. Moreover, petitioners' argument is flawed because the burden of proving fraud is always initially on respondent. Sec. 7454(a); Rule 142(b). Furthermore, assuming arguendo that the lead-check rule applies, we note it would not help petitioners. Although petitioners did not argue the lead-check rule, per se, in contesting respondent's fraud determination for 1971 and 1973, that was the substance of their argument regarding the inventory notation. *290 As we discussed previously in our fraud analysis, petitioners' inventory notation lead was illogical and contradicted by earlier statements made by Uranga. Therefore, respondent was reasonable in not further investigating the notation. C. Whether Respondent Erroneously Omitted Certain Nonincome Items
Petitioners next argue that respondent in his bank deposit analysis failed to give petitioners credit for certain nonincome items. Some of the items -- the purported loans from Richard Uranga, gifts from Minnie Mae Applegate, and coin sales -- we have addressed and rejected in our fraud analysis. Accordingly, we shall limit our discussion to the following items which we have not previously addressed. 1. Loans from Harvey McLaughlin
Petitioners contend that Harvey McLaughlin (McLaughlin), a friend of petitioners who lived with them from 1970-1975, lent them a total of $ 14,800 in 1972. At trial, McLaughlin testified that he lent the following sums to petitioners because they were experiencing financial problems: May 1, 1972
$  2,000
June 1, 1972
2,500
July 1, 1972
5,200
August 1, 1972
2,900
October 1, 1972
2,200
$ 14,800
According to *291 McLaughlin, the loans were almost always in the form of cash. McLaughlin also testified that petitioners gave him an IOU for each loan. McLaughlin further stated that after the first three loans, Uranga requested him to consolidate the IOUs into a conditional promissory note, which provided that any balance due at McLaughlin's death would be forgiven. Petitioners have introduced into evidence a document entitled conditional promissory note for $ 9,700 dated July 1, 1972, and signed on that date by petitioners and McLaughlin. McLaughlin testified that he destroyed the original IOUs after he received the conditional promissory note. According to McLaughlin, he lent petitioners additional sums after July 1, 1972. Furthermore, McLaughlin testified that petitioners issued him IOUs despite Uranga's earlier stated preference for using conditional promissory notes instead. Petitioners have also introduced into evidence a document entitled conditional promissory note for $ 5,100 dated October 1, 1972, and signed on that date by petitioners and Mclaughlin. Both documents entitled conditional promissory notes provided for interest at 8 percent per annum. McLaughlin testified that he *292 obtained the money from a hoard of twenty and fifty dollar bills that he maintained in his room. After making the loans to petitioners, McLaughlin stated that he had approximately $ 1,000 left in his cash hoard. McLaughlin testified that during the years at issue he earned between $ 15,000 and $ 20,000 per year. Furthermore, McLaughlin stated that he did not have a bank checking account until 1986. In 1979, an IRS agent interviewed McLaughlin by telephone regarding petitioners' case. McLaughlin did not disclose the existence of these loans to the agent. Indeed, the first time these loans were revealed to Packard was just before petitioners' criminal trial in 1979. McLaughlin testified that petitioners have since paid him back in full. Petitioners have introduced into evidence three cashiers checks payable to McLaughlin. The checks were all dated March 30, 1981, and drawn in amounts of $ 1,000, $ 500, and $ 1,000. Petitioners have also introduced into evidence a document listing total payments of $ 14,800 and reflecting a notation that "McLaughlin forgives any interest." McLaughlin did not write this document. Upon consideration of the relevant evidence and testimony, *293 we dismiss petitioners' contention that they received $ 14,800 in loans from McLaughlin in 1972. First, we find McLaughlin's testimony that he had a cash hoard of approximately $ 16,000 highly improbable based on his annual salary at the time. McLaughlin's testimony that he did not pay rent during those years is not sufficient to explain how he was able *861 to hoard such a relatively large sum of cash. In addition, McLaughlin's testimony is inconsistent with his earlier interview with the IRS wherein he failed to mention these loans. We are also mindful that petitioners never raised the existence of these loans until just before their criminal trial. We also reject petitioners' assertion that their repayment of the loans is proof of the loans' existence. Petitioners have introduced insufficient evidence to prove that they indeed paid off the loan. The cashier's checks in evidence merely prove that McLaughlin received $ 2,500 on March 30, 1981. The document reflecting that the loan was paid in full was not prepared by McLaughlin and is nothing more than a self-serving document, for which we accord no probative value. 2. Loans from Velma Blackwell
Petitioners also argue *294 that in 1974 they received a $ 7,000 advance from Blackwell, Hall's mother. In support thereof, Blackwell testified at trial that she lent petitioners approximately $ 7,000 in 1974. She further testified that she had made these loans periodically by issuing petitioners checks drawn on the joint account she maintained with her husband. We reject this argument as well. Blackwell's testimony is contradicted by her earlier statement to Packard, wherein she stated that she had not loaned any money to petitioners. We are not persuaded by her explanation that she did not want to disclose her financial arrangements to Packard at the time. Moreover, Hall told Packard during the investigation that he had received no loans or gifts from anyone. Furthermore, petitioners have failed to introduce any of Blackwell's checks constituting the purported loans. Nor have they introduced any evidence of repayment. 3. Gifts from Egbert Pettey
Petitioners next contend that Egbert Pettey (Pettey), a friend of theirs, had given them certain items which they sold in 1972 and 1974 for approximately $ 34,000 and $ 36,000, respectively. Petitioners assert that they kept approximately 5 percent *295 of the proceeds for living expenses and deposited the remaining proceeds into K&J's business bank account. Pettey, who had died by the time of the trial in the instant case, testified at petitioners' criminal trial that he had given them several items, including a fan collection. Petitioners introduced into evidence the transcript of that testimony. Petitioners also introduced into evidence Pettey's sworn affidavit listing the items given to petitioners. Uranga prepared the affidavit. Attached to the affidavit was a list of the items, also prepared by Uranga, purportedly showing the cost of each item to Pettey as well how much petitioners sold each item for. Uranga testified further that petitioners sold the items in 1972 and 1974, for $ 34,000 and $ 36,000, respectively. Although petitioners' evidence is sufficient to prove that they received some items from Pettey, it is insufficient to prove that the items were sold, and if sold when and for what amount. There was no indication in the transcript of Pettey's testimony at petitioners' criminal trial that he had any personal knowledge of petitioners' later sales of the items at issue. Moreover, petitioners assert that the *296 proceeds were deposited in their bank account, but have failed to show this Court any evidence of the deposits. 4. Petitioners' Garage Sale
Petitioners' finally argue that $ 5,000 of K&J's deposits in 1972 represented proceeds from a garage sale that they held. Petitioners apparently contend that these proceeds were from the sale of personal items and should not have been included as income in respondent's bank deposit analysis. Petitioners offer no evidence concerning this item other than their testimony, which we find is self-serving. Accordingly, we reject their contention that respondent should have given them credit for $ 5,000 as a nonincome item in 1972. D. Conclusion
For the reasons set forth above, we hold that petitioners have failed to prove that the deficiencies determined by respondent for 1970-1974 and 1976 are not correct. Therefore we sustain respondent's determination for those years. Addition to Tax for Fraud under Section 6653(b)
Section 6653(b) provides for an addition to tax if any part of any underpayment of tax is due to fraud. The addition *297 to tax is an amount equal to 50 percent of the amount of the underpayment. Because we have already held that some part of each petitioner's underpayments for 1970-1974 and 1976 was attributable to fraud, we also affirm respondent's additions to tax under section 6653(b) for those years. Ruidoso Racing Assn., Inc. v. Commissioner, 476 F.2d 502, 505, 507 (10th Cir. 1973), affg. in part and revg. in part a Memorandum Opinion of this Court. In light of the foregoing, Decisions will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners now appear to claim that because of significant markdowns, their gross profit percentage should have been lower. Petitioners offer no evidence of the markdowns other than their self-serving testimony, and we dismiss this argument. ↩
3. We have examined the inventory records for K&J that are in evidence. We concur with Packard's judgment that they are merely loose scraps of paper with no apparent organization and that they are not adequate to support petitioners' contentions.↩
4. See also Toussaint v. Commissioner, T.C. Memo. 1984-25, affd. 743 F.2d 309 (5th Cir. 1984); Adcock v. Commissioner, T.C. Memo. 1982-206; Technical Industrial Consultants, Inc. v. Commissioner, T.C. Memo. 1966-150↩.