**ARC ELECTRICAL CONSTRUCTION CO., Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

**No. 345, Docket 90–4049.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 4, 1990.

Decided Jan. 24, 1991.

David I. Pincus (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Mary Frances Clark, Attorneys, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellant.

Paul Friedman, New York City, for petitioner-appellee.

Before CARDAMONE and PRATT, Circuit Judges, and MUKASEY, District Judge.[*]

CARDAMONE, Circuit Judge:

The Commissioner of Internal Revenue (Commissioner or appellant) appeals from an order and decision of the United States Tax Court (Parr, J.) entered January 30, 1990 vacating its decision entered June 7, 1989. In its June 1989 decision the tax court found, *inter alia,* that taxpayer Arc Electrical Construction Co. (Arc or taxpayer) underpaid its taxes for 1974, and because the underpayment was due to fraud imposed a penalty of $27,884. On appeal the Commissioner challenges the tax court's reversal in January 1990 of its June 1989 penalty for fraud holding. Arc insists there was no underpayment and, even if there was, that it was not due to fraud.

This appeal has a Janus-like complexity because the facts reveal an overpayment and an underpayment of income taxes by the same taxpayer for the same tax year. It is not surprising that the tax court decided the case first one way, and later reversed itself and decided it the opposite way.

## BACKGROUND

Arc filed a non-fraudulent corporate tax return for 1974. Its tax return for 1977 showed it was legitimately entitled to a new jobs credit in the amount of $100,000 and also showed total tax liability of $44,-324. Taxpayer used $44,324 of the new jobs credit to reduce its tax liability to zero, carried the remainder—$55,676—back to 1974, and filed a Form 1139 (Corporate Application for Tentative Refund) seeking a "quick refund" for that amount. *See* § 6411(a) of the Internal Revenue Code of 1954 (unless otherwise indicated statutory references are to the Internal Revenue Code of 1954). Arc obtained its $55,676 refund.

The Commissioner later determined that Arc had fraudulently overstated its cost of goods sold deduction for 1977 and—after factoring in the total new jobs credit—asserted a tax deficiency of $951,315 against taxpayer for that year. Appellant concluded that this underpayment was due to fraud and therefore asserted a fraud penalty for 50% of the amount of the deficiency, or $475,658, pursuant to § 6653(b). The Commissioner further found that Arc had a deficiency for 1974, reasoning that the new jobs credit should not have been available to carry back to 1974, since had Arc stated its tax liability for 1977 honestly the credit would have been exhausted in that year. Appellant concluded that the 1974 deficiency was also due to fraud and asserted a fraud penalty of $27,838 for that year, 50% of the $55,676 refund. Arc sought review of the fraud penalties for the years 1974 and 1977 in the United States Tax Court, where it also claimed it had suffered an

* Hon. Michael B. Mukasey, United States District Court for the Southern District of New York, sitting by designation.

embezzlement loss in its business of over $13 million in the year 1980.

### A. *The First Tax Court Proceeding*

In the June 1989 proceeding the tax court held, *inter alia*, Arc liable for fraud penalties for 1974 and 1977. It also ruled that the taxpayer was the victim of a $6 million embezzlement scheme. *See Arc Electrical· Construction Co. v. Commissioner*, 56 T.C.M. (CCH) 976 (1988). The parties then recomputed Arc's taxes. The Commissioner allowed the 1977 new jobs credit to be carried back to 1974, and with the benefit of this credit found that Arc had overpaid its taxes in 1974 by $31,769. At the same time, the Commissioner also assessed a fraud penalty of $27,838 for the earlier 1974 deficiency. This was based on an underpayment of $55,676 (the amount of the "quick refund" it obtained for tax year 1974) to which the 50 percent fraud addition was applied pursuant to § 6653(b).

When the Commissioner's computations and rulings came before the tax court, it thought appellant's position was incongruous, given that the assessment of the fraud penalty for 1974 had been premised on disallowing the credit carryback. The tax court asked for an explanation. The Commissioner responded that the tax court's decision allowed Arc's 1980 embezzlement loss to be carried back to 1977, where it freed the new jobs credit that was then carried back to 1974, resulting in a $31,769 overpayment for the earlier year, but that the imposition of the fraud penalty on the underpayment of $55,676 was not affected.

Arc objected to this computation, agreeing it overpaid its taxes but contending it was not liable for the fraud penalty. The tax court was satisfied with the Commissioner's explanation, and therefore entered its June 7, 1989 decision finding that the taxpayer had overpaid its taxes for 1974 in the amount of $31,769, and imposed simultaneously a fraud penalty against Arc of $27,884 for the underpayment of $55,676 for the same year.

### B. *The Second Tax Court Proceeding*

In the January 1990 proceeding—the subject of the instant appeal—the tax court, upon Arc's motion, vacated and set aside its June 7, 1989 order. It reaffirmed the $31,769 overpayment holding, but reversed itself on the fraud penalty and held instead that Arc was *not* liable for the 1974 penalty on the $55,676 refund. *See Arc Electrical Construction Co. v. Commissioner*, 58 T.C.M. (CCH) 1235 (1990). The tax court reasoned that though Arc was only able to apply the 1977 new jobs credit in 1974 because it fraudulently understated its 1977 tax liability—thereby creating a deficiency for 1974 because the credit should not have been available to be applied to that year—the jobs credit itself was legitimate and, therefore, the 1974 deficiency was not due to fraud. From this order and decision the Commissioner appeals. We reverse.

### DISCUSSION

Two issues are presented for review: Arc contests the tax court's finding that there was an underpayment of $55,676 for 1974; the Commissioner contends that though the underpayment finding was cor-. rect, the tax court wrongly concluded that the underpayment was not due to fraud. Neither party disputes the tax court's ruling that Arc had overpaid by $31,769 its 1974 taxes.

### I Underpayment of Tax

#### A. *Is the New Jobs Credit a Rebate?*

We must first decide whether Arc underpaid its 1974 taxes. The tax court found them underpaid by $55,676, the amount of Arc's quick refund based on the new jobs credit carryback. Arc advances two arguments in support of its assertion that there was no underpayment.

The first argument, focused on the definition of the term "rebates," requires an analysis of the statutory scheme implicated in this case. Section 6653(b) imposes a fraud penalty where "any part of any underpayment (as defined in subsection (c)) of tax is due to fraud." Section 6653(c) de-

fines an underpayment as a "deficiency" as defined in § 6211(a). Section 6211(a), set forth in the margin,[1] defines a deficiency using the following formula: a deficiency equals the correct tax imposed minus the total of the tax on the taxpayer's return minus prior assessments plus rebates. *See Kurtzon v. Commissioner*, 17 T.C. 1542, 1548 (1952); *Midland Mortgage Co. v. Commissioner*, 73 T.C. 902, 907 (1980). Section 6211(b)(2) defines a rebate as "so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitle A ... was less than the excess of [the tax on taxpayer's return plus prior assessments] over the rebates previously made."

Arc contends that the term "the tax imposed by subtitle A" used, as just noted in § 6211, should be read in harmony with its use in § 11—the provision in subtitle A, entitled "Tax Imposed"—which imposes a tax on the *taxable income* of corporations. Thus construed, the determination of "the tax imposed by subtitle A" does not include items that do not affect *taxable income;* "rebates" are limited only to those items that diminish taxable income. Arc asserts that since its new jobs credit diminishes its tax liability rather than the taxable income on which tax is imposed, it cannot be a rebate and should not have been considered in the determination of whether there was an underpayment in 1974. With the new jobs credit excluded from the computation, Arc concludes, it does not have a deficiency. Hence, it cannot be liable for a fraud penalty under § 6653(b).

Credits, by definition, do not reduce taxable income, instead they diminish tax liability. *See, e.g.,* B. Bittker & M. McMahon, *Federal Income Taxation* ¶ 16–1 (1988); *Martz v. Commissioner*, 77 T.C. 749, 751– 52 (1981). Thus, though taxpayer's position perhaps has a surface appeal, the conclusion it reaches runs counter to the statutory language and the case law. Arc's proposition that a new jobs credit is not a rebate because it "is not a deduction in arriving at taxable income" would necessarily apply to all credits. If Congress planned for this result, it would not have defined rebates as including "so much of an abatement, *credit,* refund, or other repayment ...," § 6211(b)(2) (emphasis added), since credits would already be excluded. Congress, of course, did not add the word "credit" to its definition of rebates in a heedless fashion; in construing the tax code particularly, words used may not be considered surplusage. Rather, we believe Congress used the word "credit" because it wanted those credits that fall within § 6211(b)(2)—including Arc's new jobs credit—to be considered rebates.

This conclusion is buttressed by the description of the term "the tax imposed by subtitle A" in §§ 6211(b)(1) and (4). Those provisions state that "the tax imposed by subtitle A" shall be determined, for purposes of § 6211(a), without regard to certain credits allowed in subtitle A. If the term "the tax imposed by subtitle A" were construed as Arc would have it—as excluding all credits from its computation— §§ 6211(b)(1) and (4) would be superfluous; there would be no need to exclude explicitly some credits from the computation because all credits would already be excluded. *See Martz,* 77 T.C. at 752–53 ("tax imposed by subtitle A," as used in § 6211(a), is computed with reference to credits not explicitly excluded by §§ 6211(b)(1) and (4) even though credits provided in subtitle A "contemplate[ ] the calculation of the tax imposed ... independently of the determination or utilization of the particular credit"); *cf. Logan v. Commissioner*, 86 T.C. 1222, 1227 (1986) (because deficiency is computed with reference to " 'the tax imposed by subtitle A' ..., all taxes, credits, deductions, exclusions, etc., *imposed or allowed*

---

**1.** Section 6211(a) provides in pertinent part:

> For purposes of this title in the case of income, estate, and gift taxes imposed by subtitle[ ] A ... the term "deficiency" means the amount by which the tax imposed by subtitle A ... exceeds the excess of—
> (1) the sum of

> (A) the amount shown as the tax by the taxpayer upon his return ... plus
> (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—
> (2) the amount of rebates, as defined in subsection (b)(2), made.

*in subtitle A* are to be taken into consideration in calculating the existence of a deficiency") (emphasis in original).

While the description of the tax imposed by subtitle A in §§ 6211(b)(1) and (4) is for the purpose of computing the "correct tax" from which the existence of a deficiency is gauged and is not necessarily applicable to subsection (b)(2), we cannot overlook the fact that these related subsections employ identical terminology without providing differing definitions. We are persuaded, therefore, that it could not have been part of the legislative scheme to ascribe one meaning to a term that appears in one part of the deficiency formula, and ascribe a different meaning to the same term when it appears in another part of the same formula.

The view we take finds further support in those decisions that have held credits to be rebates for the purposes of § 6211(b)(2) and its predecessors despite the fact that the credits did not affect the taxpayer's taxable income. *See, e.g., Goodall v. Commissioner,* 391 F.2d 775, 809 (8th Cir.) (renegotiation credit), *cert. denied,* 393 U.S. 829, 89 S.Ct. 96, 21 L.Ed.2d 100 (1968); *Murphree v. Commissioner,* 87 T.C. 1309 (1986) (refundable energy credit); *Midland Mortgage,* 73 T.C. at 907–08 (investment credit); *Kurtzon,* 17 T.C. at 1548 (renegotiation tax credit).

Moreover, as a matter of common sense, it is more reasonable to believe it was Congress' purpose for those credits not explicitly excluded—including Arc's new jobs credit—to be considered in determining the tax imposed by subtitle A. *See Martz,* 77 T.C. at 753. Consequently, Arc's first argument must fail and the new jobs credit in 1977 carried back to 1974 is properly held to be a rebate to the taxpayer.

### B. *Does Overpayment Eliminate Deficiency?*

Arc's second argument is that because it was ultimately determined to have overpaid its taxes for 1974, a deficiency for that year cannot be found. Although the final recomputation of Arc's 1974 tax liability eliminated the deficiency because the embezzlement loss carryback to 1977 freed the new jobs credit to be applied to 1974, its argument runs afoul of well-established precedent.

As the tax court noted, where a taxpayer has fraudulently understated its tax liability, "the unforeseen circumstance that a carry-back later arises to offset the deficiency should not operate to relieve the taxpayer of the addition imposed for the fraud." *Auerbach Shoe Co. v. Commissioner,* 21 T.C. 191, 196 (1953), *aff'd,* 216 F.2d 693 (1st Cir.1954); *see also Petterson v. Commissioner,* 19 T.C. 486, 487 (1952); *Breman v. Commissioner,* 66 T.C. 61, 71 (1976). A taxpayer who commits a fraud in reporting taxes in one year may not, on account of a fortuitous carryback that later develops which eliminates tax liability for that same tax year, claim that the carryback wipes out the fraud as well. Once fraud is demonstrated, it is, as it were, frozen in time, unaffected by subsequent events. Thus, we hold that the tax court properly computed Arc's deficiency before giving effect to the subsequent embezzlement loss carryback, and correctly determined that there had been an underpayment of $55,676 for 1974.

### II Existence of Fraud

Having decided that there was an underpayment for 1974, we must now determine whether it was due to fraud, rendering taxpayer liable for a fraud penalty. Section 6653(b)(1) provided at the time relevant to this case:

> If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

In its second opinion, the tax court reversed itself and held that Arc's underpayment for 1974 was not due to fraud, reasoning that while the new jobs credit carryback causing the deficiency was only available to be carried back because Arc fraudulently understated its tax liability for 1977, the credit itself was legitimate. The Commissioner challenges this interpretation of

§ 6653(b)(1) arguing that the legitimacy of the credit does not alter the fact that Arc's 1977 fraud caused its 1974 deficiency and the deficiency was, therefore, due to fraud.

It is undisputed that Arc fraudulently understated its tax liability for 1977 and that this fraud was a "but for" cause of Arc's underpayment for 1974. The portion of the new jobs credit carried back to 1974 was available only because Arc fraudulently understated its tax liability for 1977. What is at issue is whether the causal link between Arc's 1977 fraud and its 1974 underpayment is sufficiently close to conclude that the latter was due to fraud as contemplated by § 6653(b)(1).

The case law clearly establishes that the causal link is sufficiently close to find that a deficiency is due to fraud where it is caused by the carryback or carryover of a fraudulent loss. *See, e.g., Hall v. Commissioner,* 59 T.C.M. (CCH) 608 (1990); *Toussaint v. Commissioner,* 47 T.C.M. (CCH) 913, *aff'd,* 743 F.2d 309 (5th Cir.1984); Rev. Rul. 60–215, 1960–1 C.B. 642. In Revenue Ruling 60–215, the taxpayer carried a net operating loss sustained in 1957 back to 1955 and received a refund. The ruling stated that because the loss deduction was induced by fraud and thus disallowed, the resulting deficiency in 1955 was also due to fraud. Hence, a fraud penalty was imposed. 1960–1 C.B. at 644. In *Toussaint,* the taxpayer claimed a theft loss for 1974 and carried the unused portion of the loss back to 1971, 1972, and 1973 asserting it was entitled to a tentative refund. The tax court held the loss on account of theft was fraudulently asserted, and imposed an addition to tax under § 6653(b) for each year to the extent the deficiencies in those years were attributable to the theft loss carryback. *Toussaint,* 47 T.C.M. (CCH) at 918. In *Hall,* the taxpayer carried net operating losses over from 1971, 1972, 1973, and 1974 to 1976. Again, the tax court determined that the losses were fraudulent, and ruled that the deficiency for 1976, resulting from the disallowance of the carryover, was therefore due to fraud. *See Hall,* 59 T.C.M. (CCH) at 615.

Here the tax court distinguished Revenue Ruling 60–215 and *Toussaint (Hall* had not yet been decided when the tax court issued its decision) on the ground that, in those cases, the operating losses themselves were found to be fraudulent, while here Arc's credit was legitimate. It thus decided the deficiency caused by Arc's incorrect application of the credit to 1974 was not fraudulent. We think this is a distinction without a difference. In both situations the taxpayer commits fraud by understating taxes owed then expands the fraud beyond the year in which it is committed by filing refund applications for a different year or years that overstate the amount of credit or deduction actually available, thereby obtaining a refund to which it is not entitled. Although the new jobs credit carried back in this case was not in itself fraudulently obtained, its availability for application to the carryback year 1974 was obtained through fraud. No portion of the credit would have been free to be applied to 1974 had Arc not fraudulently understated its tax liability for 1977; rather, the credit would all have been used in 1977.

Although the fraudulent loss cases are not factually on all fours with the instant case, we are unable to discern a substantive difference between the case at hand—where the taxpayer was allowed without a fraud penalty to carry back a credit to another year because the fraud it perpetrated was not as to the credit itself—and those holdings where the taxpayer was assessed a fraud penalty when it carried back or carried over a deduction to another year because it defrauded the IRS in obtaining the deduction. In essence, the $55,676 Arc underpaid in 1974 was made possible by the fraud in 1977, and the new jobs credit carryback, like the loss carryovers and carrybacks, was simply the vehicle for expanding that fraud. As a consequence, we hold that Arc's deficiency for 1974 was one that was due to fraud.

Finally, it must be noted that Arc was not penalized twice for the fraudulent misuse of its new jobs credit. Had Arc not received the full benefit of the credit after its application to 1974 been disallowed, this

would have been the case. The Commissioner computed Arc's deficiency for 1977, so as to determine that year's fraud penalty only after applying the full credit to that year. Thus, Arc was ultimately able to get the full benefit of its new jobs credit for tax purposes.

## CONCLUSION

The tax court incorrectly held that Arc's 1974 deficiency was not due to fraud. Its order and decision of January 30, 1990 are accordingly reversed and the matter is remanded to the tax court for the imposition of the addition to tax for the year 1974.

Reversed and remanded.