WILLIAM H. CALLAHAN AND LISA CALLAHAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Callahan v. Commissioner
Docket No. 39150-87
United States Tax Court
T.C. Memo 1992-132; 1992 Tax Ct. Memo LEXIS 151; 63 T.C.M. (CCH) 2285; T.C.M. (RIA) 92132; March 4, 1992, Filed *151 Decision will be entered for petitioners. Paul Friedman, for petitioners. Kevin M. Flynn, for respondent. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1978
$ 5,621
$ 2,811
1979
13,188
6,594
1980
13,470
6,735
All section references are to the Internal Revenue Code as amended, unless stated otherwise. Before trial, and without objection from petitioners, respondent was permitted to amend her answer to affirmatively assert increases in the above amounts. Respondent's amendment to answer is further described below. The principal issues for decision are: (1) Whether respondent prepared the notice of deficiency and amendment to answer in violation of the grand jury secrecy requirements of rule 6(e) of the Federal Rules of Criminal Procedure (hereinafter rule 6(e)); and (2) whether petitioners' return for each of the subject years is a false or fraudulent return with the intent to evade tax, within the meaning of sections 6501(c) and 6653(b). FINDINGS OF FACT Some of the facts *152 have been stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. Respondent issued a notice of deficiency to petitioners Mr. William H. Callahan and Mrs. Lisa Callahan, husband and wife, in which she determined the tax deficiencies and additions set out above. In this opinion, we refer to Mr. William H. Callahan as petitioner. At the time the subject petition was filed, petitioners resided in New York City, New York. The adjustments made by respondent in the subject notice of deficiency are based upon her determination that petitioners realized unreported income in the form of payments and personal benefits from Arc Electrical Construction Co., Inc. (Arc). During the years in issue, Arc was an electrical contractor engaged in new electrical construction, major renovations, and service work. It employed approximately 500 people, including petitioner. Its principal office was located in New York City, New York. The notice of deficiency identifies the payments and personal benefits which petitioners allegedly received from Arc as follows: Unreported Income
1978
1979
1980
(1) Cash received from
$   -0- $   -0- $  7,800
Oxford Travel
(2) False petty cash vouchers
-0- -0- 2,635
(3) Economy Buying Service
15,511
8,900
-0- (4) Payments on credit cards
(a) VISA
-0- 5,824
8,035
(b) MasterCard
-0- 4,278
5,583
(c) American Express
-0- 7,106
4,197
(5) Payments from S. Caputo
(Bloomingdale's)
-0- 5,408
-0- Total increases to
taxable income
$ 15,511
$ 31,516
$ 28,250
*153 Throughout this opinion, references to "items" are references to the above items of unreported income, as determined by respondent in the notice of deficiency. Respondent's amendment to answer asserts that petitioners received the following additional unreported income: Additional Unreported Income
1978
1979
1980
False petty cash vouchers
$  7,800
$ 7,800
$ 5,165
(See item 2, supra)
Payments on credit cards
American Express
(See item 4(c), supra)
8,397
-0- -0- Total
$ 16,197
$ 7,800
$ 5,165
We note that the above "additional income" from false petty cash vouchers during 1980, $ 5,165, plus the 1980 amount identified in item 2, $ 2,635, total $ 7,800, the same as the amounts for 1978 and 1979. Petitioner grew up with his father, Mr. William Callahan, Sr., his mother, Mrs. Eleanor V. Callahan, his brother, Charles, and his sister, Eleanor. The family lived in a large house in Scarsdale, New York, until petitioner was 14 years old. At that time, they moved to a large house in New Rochelle, New York, which was situated on approximately 5 acres of land. Petitioner had a privileged childhood. The family employed a staff of approximately five persons. They *154 took vacations on private planes. Petitioner spent a number of summers at private camps. On his 16th or 17th birthday, petitioner's father gave him an automobile. Similarly, petitioner's sister, Eleanor, was given a new Mercedes-Benz when she turned 16 years of age. Petitioner's mother is the youngest daughter of Mr. Charles Rao, one of the founders of Arc. During the subject period, Mr. Rao was Chairman of Arc's board of directors. The other officers and directors of Arc were predominantly members of Mr. Rao's family. His son-in-law, Mr. Alfred Minervini, was president. Mr. Minervini's son-in-law, Mr. Grant Stinchfield, was a vice president. Petitioner's father, Mr. Rao's other son-in-law, was executive vice president and treasurer. Mr. Rao's three daughters, Ms. June V. Minervini, Ms. Callahan (petitioner's mother), and Ms. Edith A. Pope, were directors. Other directors included Mr. Rao and his two sons-in-law, Messrs. Alfred Minervini and Callahan, Sr. During the years in issue, Arc's stock was held principally by Mr. Rao, his three daughters, and members of their families. Petitioner, his mother, and his father owned a total of approximately 27.8 percent of the outstanding *155 stock of the company. Petitioner began his employment with Arc after he graduated from high school in July of 1972. He was approximately 18 years of age at the time. He started as an estimator in the estimating department of the company at its main offices located at 737 Second Avenue in Manhattan. In that position, he was responsible for estimating the prices of electrical construction projects in office buildings, hospitals, power plants, and other structures. After approximately 2 years, he was promoted to assistant project manager in the alterations department. His responsibilities included pricing jobs which involved alteration work and interior renovation work. On November 1, 1977, at approximately 23 years of age, petitioner became an officer of Arc with the title secretary and, in the same month, he married petitioner Lisa Callahan. During that year, petitioner became assistant project manager for a large job at 111 Wall Street, New York City, New York. His office was moved from the company's main office to 99 Wall Street. Within approximately 1 year, petitioner was promoted to project manager and was given responsibility for directing all aspects of the electrical *156 contracting work performed by Arc at the 111 Wall Street project. This included supervising the work of approximately 50 Arc employees. Arc paid petitioner an annual salary of $ 22,811, $ 24,198, and $ 30,975, in taxable years 1978, 1979, and 1980, respectively. The company also provided him with a company car and gasoline credit cards during those years. He was authorized to charge on Arc's account at Best Oldsmobile automotive service center in Mount Vernon, New York. During the years in issue, petitioner's father, Mr. Callahan, Sr., employed several schemes to embezzle money from Arc. One of those schemes involved a false petty cash system. Under that system, an employee would submit a false petty cash slip and would receive payment from Arc. In some cases, the employee would keep the money and, in this manner, would receive additional salary which was not recorded as such on Arc's books. In other cases, the employee would return the money to Mr. Callahan, Sr. Petitioner admits submitting false petty cash vouchers to his father, or in his absence to Arc's office manager, Mr. Bruno, but petitioner states that the money which he received prior to September 22, 1980, was *157 given to his father. Messrs. Caesar Santorelli and William Feraudo, who were vice presidents of Arc, also admit receiving money from Arc in payment of false petty cash vouchers but they also state that they gave the money to Mr. Callahan, Sr. Another scheme which Mr. Callahan, Sr., used to embezzle moneys from Arc involved false invoices. Under this scheme, a vendor would submit a false invoice to Arc, and Mr. Callahan, Sr., would authorize payment of the invoice. After the vendor received Arc's payment, he would return the cash to Mr. Callahan, Sr., after deducting a commission for his role in the scheme. Mr. Callahan, Sr., gave petitioner and others various items of personal property by means of this false invoicing scheme. He did this through one of the vendors who participated in the scheme, Mr. David Weiss, the owner of Economy Export, Ltd.Mr. Weiss supplied petitioner with various goods, such as television sets, video equipment, refrigerators, fans, and vacuum cleaners, as well as funds to buy a used automobile. Mr. Weiss was paid for the goods which he supplied to petitioner by deducting their cost from the proceeds which he received from Arc under the false invoice *158 system described above. During 1978 and 1979, petitioner received goods in this manner which were worth $ 15,511 and $ 8,900, respectively. (See item 3, supra.) While petitioner placed orders with Mr. Weiss for the goods he received, he considered them to be gifts from his father. With only one exception, petitioner always asked his father for permission before placing an order with Mr. Weiss. On the one occasion that petitioner placed an order without Mr. Callahan, Sr.'s prior approval, petitioner was reprimanded by his father. Initially, Mr. Weiss accepted orders from petitioner only if petitioner had received Mr. Callahan, Sr.'s prior approval. From time to time, petitioner gave statements from his personal charge accounts to his father and asked his father to pay them. During 1978, petitioner asked his father to pay American Express statements totaling $ 8,397. (See table of Additional Unreported Income, supra.) During 1979, he asked his father to pay statements from his accounts with VISA, MasterCard, and American Express which totaled $ 5,824, $ 4,278, and $ 7,106, respectively. (See item 4, supra.) During 1980, he asked his father to pay statements from *159 his accounts with VISA, MasterCard, and American Express which totaled $ 8,035, $ 5,583, and $ 4,197, respectively. During 1979, petitioner asked his father to pay statements from his account at Bloomingdale's which totaled $ 5,408. These statements were paid on petitioner's behalf by Mr. Steve Caputo, the proprietor of the Shazam Restaurant in East Hampton. (See item 5, supra.) Mr. Caputo was later reimbursed by Arc. Mr. Callahan, Sr., caused Arc to pay all of the above statements. Petitioner was unaware that the statements had been paid by Arc. He was also unaware that Arc's payments had been improperly allocated to, and written off as expenses against, the Wall Street project which he supervised. During 1979, the Examination Division of the Internal Revenue Service began a civil tax audit of Arc and its principals. Revenue Agent Thomas Menake of the Manhattan District made an on site investigation of Arc's books and records. In late 1979, Mr. Menake referred certain returns of Arc and various of its principals to the Criminal Investigation Division for investigation. This referral was accepted and Special Agent Garrett Howard was assigned to the case. Occasionally, *160 petitioner asked his father for money. During 1980, Mr. Callahan, Sr., gave petitioner six checks drawn by Oxford Travel Company which totaled $ 7,800. (See item 1, supra.) The date and amount of each check is as follows: Date
Amount
01/29/80
$   800
02/21/80
1,600
05/08/80
1,700
05/29/80
1,700
07/29/80
900
07/29/80
1,100
Total
$ 7,800
Petitioner considered these amounts to be gifts from his father. He deposited the checks into his bank account and did not report them as income on his 1980 return. Mr. Callahan, Sr., caused other employees of Arc to receive compensation in the form of payments from Oxford Travel. For example, Messrs. Santorelli and Feraudo each received $ 2,250 per quarter in this manner. In September 1980, while on one of his weekly visits to obtain his pay check at Arc's main office, petitioner stumbled upon papers in his father's office which showed that Arc was in serious financial difficulty. After further investigation, petitioner discovered evidence of the illegal practices being pursued by his father. When petitioner confronted his father with this discovery, his father threatened to kill him, if he did not keep quiet. Nevertheless, *161 petitioner informed his aunt, Ms. Edith Pope, a director of Arc, and her husband of what he had learned. Shortly thereafter, on September 22, 1980, Mr. Callahan, Sr., resigned from Arc. On March 18, 1981, Mr. Callahan, Sr., was found murdered in Kenosha, Wisconsin. At the time of his father's resignation, several key employees of Arc were receiving additional salary through the false petty cash system described above. These employees threatened to quit unless their salaries continued without reduction. Similarly, when his father left Arc, petitioner took on added responsibilities and new duties at Arc. As a result, petitioner believed that he was entitled to additional compensation. Initially, for several weeks after Mr. Callahan, Sr., left Arc, Mr. Rao refused to increase the regular payroll but he agreed to continue paying salary supplements to certain key employees through the false petty cash system. During this time, petitioner obtained additional compensation of $ 1,827.31 by submitting false petty cash vouchers. Petitioners inadvertently failed to report this amount on their 1980 income tax return. In November 1980, Mr. Rao agreed to increase the salaries of petitioner *162 and certain other employees. Set out below is a comparison of the 1980 and 1981 salaries of these employees: Employee
1980
1981
Minervini
$ 52,215.00
$ 92,135.05
Callahan Jr.
30,975.00
69,455.05
DeFabritus
43,140.00
78,903.05
Santorelli
34,991.00
62,854.05
Feraudo
35,010.00
65,504.05
Bruno
29,528.00
45,223.05
After his father's resignation, petitioner asked his grandfather, Mr. Rao, to pay certain credit card bills on his behalf. Petitioner protested to Mr. Rao when he discovered that Mr. Rao had allocated the bills to an Arc account. As a result of Mr. Rao's allocation and the ongoing Internal Revenue Service tax investigation, petitioner included these amounts in income on his 1980 Federal income tax return. In August 1981, a grand jury had been convened in the Southern District of New York to investigate corruption in the electrical contracting industry in New York City. That grand jury investigation was expanded to include an investigation into whether any criminal tax offenses under title 26 of the United States Code had been committed by Arc or several of its officers, directors, shareholders, and employees. The grand jury finished its investigation *163 of Arc in December 1986. Arc and several of its officers, shareholders, and employees were charged with various criminal offenses. Arc pleaded guilty to conspiracy to defraud the United States, under 18 U.S.C. section 371, and was fined $ 10,000. The president of Arc, Mr. Alfred Minervini, pleaded guilty to conspiracy to defraud the United States, under 18 U.S.C. section 371, and was sentenced to 5 years in prison, of which 3 months was to be served and the balance suspended. Mr. Minervini was also fined $ 1,000 and ordered to perform community service. A vice president and secretary of Arc, Mr. Grant P. Stinchfield, pleaded guilty to aiding and abetting the filing of a false and fraudulent corporate income tax return, under section 7206(2). He received a sentence of 3 years in Federal prison, of which 60 days was to be served and the balance suspended. Mr. Stinchfield was also placed on probation for 5 years and ordered to perform community service. Another vice president of Arc, Mr. DeFabritus, pleaded guilty to tax evasion under section 7201 and received a suspended sentence of 3 months in Federal prison. He was also placed on probation for 5 years and was required to *164 pay approximately $ 150,000 in delinquent Federal income taxes. Another vice president of Arc, Mr. Caesar Santorelli, was granted immunity and testified before the Arc grand jury. Under an agreement with the prosecution, Mr. Santorelli filed amended Federal and State income tax returns for the taxable years 1978, 1979, and 1980, which reported the false petty cash and the Oxford payments that he omitted from his original returns. Mr. Weiss of Economy pleaded guilty to conspiracy to defraud the United States, under 18 U.S.C. section 371. He received a sentence of 6 months in prison and was fined $ 10,000. Petitioner was also a target of the grand jury. However, when the grand jury finished its work, the prosecutors discontinued the investigation against him and he was never charged with a criminal offense stemming from the facts described above. Respondent determined tax deficiencies in Arc's 1974 and 1977 income tax returns, and she determined additions to tax for fraud with respect to the returns for both years. Arc petitioned this Court for redetermination of those deficiencies and additions (docket Nos. 6692-82 and 20563-82). In November 1986, for purposes of presenting *165 the Arc case to this Court, respondent obtained an order pursuant to rule 6(e)(3)(C)(i) from the United States District Court for the Southern District of New York permitting disclosure of the information which had been presented to the grand jury. We refer to this order as the order dated November 7, 1986. At the trial of the Arc case in January of 1987, Arc moved to suppress certain evidence, on the ground that the Commissioner's use of the evidence violated rule 6(e)(3)(C)(i). In its motion, Arc argued that, in obtaining the order dated November 7, 1986, the Commissioner had misled the District Court and had not shown the "particularized need", as required for disclosure of a matter occurring before the grand jury. In a reviewed opinion, Arc Electrical Construction Co. v. Commissioner, 91 T.C. 947 (1988), this Court denied Arc's motion. Shortly thereafter, the Court filed a Memorandum Findings of Fact and Opinion in Arc Electrical Construction Co. v. Commissioner, T.C. Memo. 1988-592, revised by T.C. Memo. 1990-30, revd. and remanded 923 F.2d 1005 (2d Cir. 1991). The facts found by the Court in *166 that opinion involve many of the matters which are the subject of this opinion. OPINION 1. Grand Jury Secrecy Rule
Petitioners contend that both the notice of deficiency and respondent's amendment to answer in this case are based on "matters occurring before the grand jury" in violation of the grand jury secrecy requirements of rule 6(e)(2). Petitioners contend that in formulating the subject notice of deficiency and amendment to answer, respondent's use of grand jury information which originally had been obtained for use in the Arc trial, pursuant to the order dated November 7, 1986, "constitutes a new use and disclosure, and requires a new rule 6(e) Order". Accordingly, they argue that the notice of deficiency should be invalidated and this case should be dismissed. We disagree. Generally, rule 6(e)(2) prohibits disclosure of matters occurring before the grand jury. It provides as follows: (2) General Rule of Secrecy. A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision *167 shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of rule 6 may be punished as a contempt of court.
Certain exceptions to the above secrecy rule are provided in rule 6(e)(3). One of those exceptions, rule 6(e)(3)(C)(i), provides as follows: (3) Exceptions * * * (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made -- (i) when so directed by a court preliminarily to or in connection with a judicial proceeding; * * *
To find a violation of rule 6(e), we must find not only that the information is a matter occurring before the grand jury, but also that it was wrongfully disclosed. See Berkery v. Commissioner, 91 T.C. 179, 188 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989). The phrase, "matters occurring before the grand jury", has been defined to include anything that would reveal what transpired during the grand jury proceedings. In re Grand Jury Investigation, 610 F.2d 202, 216-217 (5th Cir. 1980). *168 The purpose of rule 6(e) is to protect from disclosure the "essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process". E.g., In re Grand Jury Investigation, 630 F.2d 996, 1000 (3d Cir. 1980). In this case, the information which respondent used in preparing the notice of deficiency and amendment to answer falls into three categories. The first category is information obtained by respondent after the grand jury investigation was completed; that is, information which was not obtained for, or presented to, the grand jury. This category includes the statements obtained by respondent's counsel in December 1988, from an interview with Mr. William Bruno, the former office manager of Arc. During that interview, Mr. Bruno told respondent's attorney that between 1978 and 1980, petitioner was paid approximately $ 150 per week (or $ 7,800 per year) in false petty cash. Respondent used Mr. Bruno's statements as the basis for the assertion in the amendment to answer that petitioner had received $ 7,800 per year from false petty cash vouchers during 1978, 1979, and 1980. (See table of Additional Unreported *169 Income, supra.) This category also includes a schedule prepared by Mr. Weiss of Economy Buying Service listing the goods supplied to petitioners, for which he had received payment from Arc. (See item 3, supra.) Mr. Weiss gave the schedule to respondent's attorney, after the attorney had interviewed Mr. Weiss while preparing the Arc case for trial. The grand jury had completed its investigation at the time this interview took place. Respondent used the Weiss schedule, rather than any grand jury documents, to determine the value of the goods which Mr. Weiss supplied to petitioner during 1978 and 1979. We hold that Mr. Bruno's statements and Mr. Weiss' schedule are not matters occurring before the grand jury and, accordingly, are not subject to rule 6(e). Phillips v. United States, 843 F.2d 438, 441 (11th Cir. 1988). The second category consists of information which was presented to the grand jury and later introduced into evidence at the Arc trial. This category includes the checks drawn by Oxford Travel (see item 1, supra), the false petty cash vouchers for 1980 totaling $ 2,635, the amount listed in the notice of deficiency (see item *170 2, supra), the VISA credit card receipts (see item 4a, supra), the MasterCard credit card receipts (see item 4b, supra), and one of several American Express charge card receipts (see item 4c, supra). We emphasize that all of these items were introduced into evidence at the Arc trial. Rule 6(e) is not intended to shield for all time revelation of the information which is presented to a grand jury. United States v. Interstate Dress Carriers, Inc., 280 F.2d 52, 54 (2d Cir. 1960); Bell v. Commissioner, 90 T.C. 878, 903 (1988). For example, if information which was presented to a grand jury becomes part of the public record, it is no longer covered by the guarantees of secrecy surrounding a grand jury investigation. E.g., Sisk v. Commissioner, 791 F.2d 58, 60 (6th Cir. 1986); Bell v. Commissioner, supra at 903-904. In Sisk v. Commissioner, supra, the court held that the grand jury information at issue in that case became a matter of public record when it was introduced into evidence at the taxpayer's criminal trial and it was no longer protected by the guarantees *171 of secrecy surrounding a grand jury investigation for purposes of determining the taxpayer's civil tax liability. In this case, as mentioned above, all of the documents in the second category were introduced into evidence during the Arc trial and became part of the public record of that proceeding. That disclosure took place in conformity with the order dated November 7, 1986, and thus in conformity with one of the exceptions to the secrecy requirement contained in the rule itself, rule 6(e)(3)(C)(i). In light of that disclosure, we perceive no purpose which would be served in limiting respondent's use of those documents in this proceeding. We reject petitioners' argument that unlike Sisk v. Commissioner, supra, Here, we have two different taxpayers and respondent seeks to use grand jury material obtained pursuant to a 6(e) order in the first taxpayer's civil trial in the second taxpayers' trial without first obtaining a new 6(e) order.
Petitioners' argument misses the point that once the veil of secrecy concerning an aspect of the grand jury deliberations has been lifted in conformity with rule 6(e), then the policy of the rule has been *172 served. After all, once lifted, the veil of secrecy cannot be restored. The third category consists of documents obtained during the grand jury investigation of Arc but not introduced into evidence at the Arc trial. Included in this category are the remaining American Express charge card receipts used by respondent in preparing both the notice of deficiency and amendment to answer. (See item 4c and the table of Additional Unreported Income, supra.) Also included in this category are the checks issued by Mr. Steve Caputo in payment of petitioners' account at Bloomingdale's. (See item 5, supra.) Respondent obtained the American Express receipts and the Caputo checks pursuant to the order dated November 7, 1986, which permitted their use in the Arc trial. They were in the courtroom, on respondent's counsel table, during the Arc trial. Further, petitioner was questioned about these items during the Arc trial. Rule 6(e) is not intended to cloak individuals who are under investigation in a protective mantle of concealment; it is only intended to protect from disclosure what is said or what takes place in the grand jury room. United States v. Interstate Dress Carriers, Inc., supra at 54; *173 Bell v. Commissioner, supra at 903. When a document which was once presented to a grand jury, such as a business record kept in the normal course of a business, is later used for the information contained in the record, rather than to learn about the deliberations of the grand jury, it is not a valid defense to disclosure that the same information previously had been revealed to a grand jury. In re Grand Jury Investigation, 630 F.2d at 1000-1001; United States v. Interstate Dress Carriers, supra at 54; Bell v. Commissioner, supra at 903; Hajecate v. Commissioner, 90 T.C. 280, 285 (1988). In this case, respondent used the documents comprising the third category, described above, as the basis for her determination that petitioners received additional income from Arc in the amount of the American Express receipts and Mr. Caputo's canceled checks. Petitioners have offered no reason for us to believe that respondent's use of these documents revealed any aspect of the deliberations of the grand jury. We fail to perceive how respondent's use of these documents in preparing *174 the notice of deficiency and amendment to answer revealed anything about the grand jury deliberations. The existence of these records had been disclosed in open court during the Arc trial when petitioner was examined. Consequently, we find no violation of the grand jury secrecy rule in respondent's use of the remaining American Express receipts and Caputo checks in preparing the notice of deficiency and amendment to answer. 2. False or Fraudulent Returns Within the Meaning of Sections 6501(c) and 6653(b)
Petitioners' returns for 1978, 1979, and 1980, which are at issue in this case, were filed more than 3 years before the subject notice of deficiency was mailed. Therefore, assessment of the deficiencies and additions determined in the notice is barred by the period of limitations on assessments, sec. 6501(a), unless one of exceptions to the period of limitations is applicable. See sec. 6501(c). Respondent contends that the exception for false returns set forth in section 6501(c)(1) applies in the case of each of the returns at issue. Section 6501(c)(1) provides that in the case of a "false or fraudulent return with the intent to evade tax", the tax may be assessed *175 at any time. Respondent contends that each of the subject returns is a false return and that she can assess the deficiency determined in the case of each return at any time. Respondent has the burden of proving that a return is a false return within the meaning of section 6501(c)(1). E.g., United States v. Borchardt, 470 F.2d 257, 261 (7th Cir. 1972). In passing, we note that in her answer, respondent makes the following affirmative allegation: The statutory notice of deficiency setting forth the respondent's determination of the petitioners' deficiency for the taxable year 1980 was timely sent to the petitioners by certified mail on October 14, 1987, which date was prior to the expiration of the 6-year period for assessment applicable under IRC sec. 6501(e)(1)(A).
Respondent bears the burden of proving that the extended 6-year statute of limitations is applicable to petitioners' 1980 return. Davenport v. Commissioner, 48 T.C. 921, 927-928 (1967); Quantz v. Commissioner, T.C. Memo. 1990-39. Respondent did not raise the application of section 6501(e)(1)(A) in her trial memorandum or in either of her post-trial *176 briefs. Accordingly, we find that respondent has abandoned this issue. Mary v. Commissioner, T.C. Memo. 1989-118. Consistent with respondent's position that section 6501(c)(1) applies in this case, she determined in the notice of deficiency that petitioners are both liable for the fraud addition, pursuant to section 6653(b), with respect to each of the returns. Under section 6653(b), respondent has the burden of proving by clear and convincing evidence that there is an underpayment of petitioners' tax for each year, and that some part of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b) of the Tax Court Rules of Practice and Procedure. The same definition of fraud applies to both section 6501(c)(1) and section 6653(b). See Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985); Ruidoso Racing Association v. Commissioner, 476 F.2d 502, 505 (10th Cir. 1973), affg. T.C. Memo. 1971-194. Respondent has the same burden of proof under both sections. Bryan v. Commissioner, 209 F.2d 822, 825 (5th Cir. 1954). Accordingly, we will consider both of these issues together. Respondent *177 argues that petitioners omitted from gross income all of the items identified in the notice of deficiency and amendment to answer, and that the omission of each item was due to fraud. Respondent's position, in summary, is that petitioners are both liable for the fraud addition because they received cash and personal property from Arc during 1978, 1979, and 1980, in the aggregate amounts of $ 31,708, $ 39,316, and $ 33,415, respectively. At trial, respondent proved that petitioner received the cash and property itemized in the notice of deficiency and amendment to answer. In fact, petitioner concedes that he received those amounts and further concedes that he kept those amounts, except for the moneys from false petty cash vouchers which he claims to have returned his father. Respondent also proved at trial that Arc supplied the funds from which the cash and property were paid, and respondent proved that petitioners failed to report these amounts as income. Finally, respondent proved at the trial of this case and in the Arc case that a number of schemes existed during the subject years, not only to embezzle moneys from Arc, but also to fraudulently evade the Federal income *178 tax of Arc and others. The problem with respondent's proof is that she has not shown that petitioners filed the subject returns with intent to evade tax. Fraud, of course, may not be found under "circumstances which at the most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). In order to establish fraud, respondent must show that petitioners intended to evade tax, which they knew or believed they owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of the tax. Raley v. Commissioner, 676 F.2d 980, 983 (3d Cir. 1982); Stoltzfus v. United States, 398 F.2d 1002, 1004-1005 (3d Cir. 1968). As to petitioner Lisa Callahan, respondent's proof fails to implicate her in any form of intentional wrong doing. There is no basis in the record to find that any part of the underpayment in any of the years at issue is due to the fraud of petitioner Lisa Callahan, as required by section 6653(b). Therefore, we hold that the fraud addition determined by respondent does not apply to petitioner Lisa Callahan. *179 As to petitioner William H. Callahan, we feel compelled to make several observations before discussing the specific items raised by respondent in the notice of deficiency and amendment to answer. We have difficulty accepting respondent's contention that petitioner received the subject cash and property as additional compensation from Arc and intentionally failed to report those amounts for Federal income tax purposes, knowing them to be income. There is nothing in the record which contradicts petitioner's testimony that he received the false petty cash payments as agent or conduit for his father, and that he received the other moneys and goods identified by respondent as gifts from his father. Respondent asks us to find that petitioner's testimony is untrue, and asks us to infer that petitioner engaged in the subject schemes and that he did so with an evil motive. Respondent was ably represented but had the difficult task of proving petitioner's fraud from his own testimony and from the fact that corruption was so prevalent throughout the company. However, we found petitioner's testimony to be largely credible and consistent with his prior testimony before this Court. Moreover, *180 we have difficulty inferring petitioner's corruption based upon the corruption which took place around him. It is clear that petitioner did not initiate or control the embezzlement schemes described above. Petitioner was approximately 22 to 26 years old during the years at issue. He occupied a relatively low-level position with the corporation, he did not have an office in the corporate headquarters, he was not privy to the books of the corporation, and he had no control over the financial affairs of the company. He had no check signing authority and he had no authority to approve corporate expenditures, such as identified by respondent in the notice of deficiency. Indeed, petitioner's testimony, which is corroborated by others, is that his investigation and actions ultimately brought the fraud at Arc to light and caused his father's resignation. Oxford Travel Checks, Item 1
During 1980, petitioner received six checks drawn to his order by Oxford Travel Company totaling $ 7,800. Respondent contends that these checks were received by petitioner in his capacity as an officer and employee of Arc and were additional compensation. In support of this contention, respondent *181 notes that Mr. Callahan, Sr., devised this system to pay off-the-book bonuses to officers and employees of Arc. Respondent notes that employees other than petitioner received checks from Oxford Travel as additional compensation. Thus, she argues, the payments to petitioner were additional compensation from Arc and not gifts from petitioner's father. We note that the checks issued to other officers or employees of Arc were usually issued on a quarterly basis and for set amounts. For example, Mr. Santorelli testified that he and Mr. Feraudo received bonuses of $ 2,250 per quarter. The checks issued to petitioner, on the other hand, were issued on a random basis and varied in amount. Thus, contrary to respondent's argument, the Oxford checks received by petitioner appear to be unlike the checks issued to other Arc employees. Moreover, we believe petitioner's testimony that he considered these amounts to be gifts from his father. Therefore, respondent failed to prove that petitioner acted fraudulently by failing to include the Oxford Travel checks in income for 1980. False Petty Cash Vouchers, Item 2
In her notice of deficiency, respondent determined that petitioners fraudulently *182 failed to report $ 2,635, which they received from Arc in 1980 as proceeds from false petty cash vouchers submitted to Arc. In her amendment to answer, respondent asserts, in effect, that petitioner received $ 7,800 from false petty cash vouchers submitted to Arc during each of the years at issue, and that petitioners fraudulently failed to report those amounts for Federal income tax purposes. Petitioner admits submitting false petty cash vouchers to Arc but he claims to have done so on his father's instructions, and he claims that he did not keep the money received from the vouchers until his father left Arc on September 22, 1980. Before that time, he cashed the false petty cash checks received from Arc and gave the money to his father. Petitioner states that he only kept the money from the legitimate expenses. After Mr. Callahan, Sr.'s resignation, Mr. Rao initially refused to increase Arc's payroll. Petitioner admits keeping money from false petty cash vouchers which totaled $ 1,827.31, as additional compensation for the new duties and greater responsibilities which he assumed at Arc. Petitioner acknowledges that he inadvertently omitted reporting the compensation in income. *183 Respondent contends that petitioner's explanation that the money obtained from the false petty cash vouchers was delivered to Mr. Callahan, Sr., is unbelievable. Respondent asks us to infer that petitioner cashed the checks for himself, not for his father, based upon the fact that tellers' notations on the checks indicate that smaller bills were paid. Respondent claims that Mr. Callahan, Sr., carried large amounts of cash and preferred bills of larger denominations. Finally, respondent points out that, in late 1980 when the false petty cash system was discontinued, each participant received a corresponding increase in his salary for 1981. According to respondent, these salary increases were intended to make up for the salary which had been paid through the false petty cash system. Petitioner's salary increased from $ 30,975 in 1980 to $ 69,455 in 1981. Mr. DeFabritus' salary increased from $ 43,140 in 1980 to $ 78,903 in 1981. Messrs. Santorelli and Feraudo also received corresponding increases. We believe petitioner's testimony that prior to September 22, 1980, he returned to his father the money received from false petty cash vouchers. Money received as a mere agent or *184 conduit for another is not includable in gross income. Liddy v. Commissioner, 808 F.2d 312, 314 (4th Cir. 1986), affg. T.C. Memo. 1985-107; Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Accordingly, respondent has not shown that the funds received from false petty cash vouchers in 1978, 1979, and the period in 1980 until Mr. Callahan, Sr., resigned, was income to petitioner. With regard to the $ 1,827.31 which petitioner received in 1980 after his father resigned from Arc, we believe petitioner's testimony that his failure to include that amount in income for 1980 was inadvertent. Therefore, respondent has not shown that petitioner acted fraudulently in failing to include in income any of the moneys he received from the false petty cash system. Economy Buying Service, Item 3
Respondent determined that petitioners fraudulently failed to report $ 15,511 and $ 8,900, the value of certain consumer goods which they received in 1978 and 1979 from Mr. Weiss' Economy Buying Service. Respondent concludes that these goods were additional compensation from Arc and not gifts *185 from petitioner's father. Respondent argues that the quantity of the goods was too large to be a gift and that items purchased went beyond the merchandise Economy normally sells. Respondent notes that petitioner obtained a check from Mr. Weiss that was used to purchase an automobile. Moreover, respondent notes that Mr. Callahan, Sr., informed Mr. Weiss that "his son would take care of" the amount owed to Mr. Weiss. Respondent states that petitioner's refusal to pay Mr. Weiss after Mr. Callahan, Sr., left Arc, coupled with Mr. Callahan, Sr.'s statement to Mr. Weiss, indicate that petitioner knew that Arc, not petitioner's father, was paying the bills. We disagree. Petitioner testified that he thought his father was paying for the goods. We believe petitioner's testimony. Furthermore, we do not agree with respondent that Mr. Callahan, Sr.'s statement to Mr. Weiss raises the inference that petitioner knew the nature of the embezzlement scheme. The fact is that petitioner refused to pay Mr. Weiss. In any event, we hold that respondent has not proven that petitioner fraudulently failed to include in income the value of the goods received from Economy. Credit Card Payments, *186 Items 4 and 5
In her notice of deficiency, respondent determined that petitioners fraudulently failed to report $ 17,208 in 1979 and $ 17,815 in 1980, the amount of petitioners' credit card charges which were paid by Arc on petitioner's behalf. (See item 4, supra.) Respondent also determined that petitioners fraudulently failed to report $ 5,408 in 1979, consisting of charges to their Bloomingdale's account which were paid by Mr. Caputo on their behalf. (See item 5, supra.) In her amendment to answer, respondent asserts that petitioners fraudulently failed to report an additional $ 8,397 in 1978, consisting of charges on petitioners' account at American Express which were paid by Arc on petitioner's behalf. (See table of Additional Unreported Income, supra.) Respondent asks the Court to infer that petitioner's omission of these amounts was due to fraud based upon the "massive fraud" throughout the company. Respondent contends that certain key officers, directors, shareholders, and employees of Arc, including petitioner, ran the company to benefit themselves and that the primary means by which they evaded tax was to omit from income personal expenses which were *187 paid by the company. According to respondent, petitioner knew that certain personal expenses such as gasoline and charges at a hardware store were paid by Arc. Therefore, respondent concludes that petitioner must have known that the credit card bills given to his father for payment were paid by Arc. Further, respondent states that petitioner must have known that Arc paid his credit card bills because they were written off as expenses against the job which petitioner supervised at 111 Wall Street. Respondent also argues that petitioner's fraud is shown by the fact that he gave his credit card bills to Mr. Rao after Mr. Callahan, Sr., departed Arc. Petitioner testified that he thought that the credit card payments were made by his father and he was unaware until his father left Arc that the charges were being paid by the company. In the final analysis, we believe petitioner's testimony on that point. Therefore, we find that respondent did not prove that petitioner fraudulently failed to include the credit card payments in income. Decision will be entered for petitioners.